# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| JOHN VAN ORDEN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 4:09CV00971 AGF |
| | ) | |
| KEITH SCHAFER, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## AMENDED MEMORANDUM OPINION

This class action is before the Court following a bench trial to address Plaintiffs'

claims in their Fifth Amended Complaint. Plaintiffs are civilly committed residents of the

Missouri Department of Mental Health's ("DMH") Sex Offender Rehabilitation and

Treatment Services ("SORTS") facilities, who have been declared sexually violent predators

("SVP") under Missouri's SVP Act, Mo. Rev. Stat. §§ 632.480–632.525. Plaintiffs state

claims under 42 U.S.C. § 1983, asserting that the SVP Act is unconstitutional as written and

as applied to SORTS, and that the reimbursement sought by the state from SORTS residents

is also unconstitutional.

**Parties**

Plaintiffs are civilly committed residents of SORTS, who were committed to the

custody of the DMH by a judgment of a Missouri circuit or probate court, pursuant to the

SVP Act. On September 30, 2011, the Court certified this case as a class action under

Federal Rule of Civil Procedure 23(b)(2). The Court certified two classes: (1) a "Treatment

Class" consisting of persons who are, or will be, during the pendency of this action,

residents of SORTS as a result of civil commitment, and (2) a "Charging Class" consisting of persons who were, are, or will be, during the pendency of this action, residents of SORTS as a result of civil commitment, and who have been, or will be, billed or charged for care, treatment, room, or board by SORTS.

On the last day of trial, the parties informed the Court of their agreement that named Plaintiffs Macon Baker, David Brown, Joseph Bowen, and William Murphy are not members of the Treatment Class because they were solely pre-trial detainees,[1] and that as such, their claims relating to treatment are moot. Baker and Brown were never committed to SORTS because a jury found that they did not meet the criteria of an SVP. And as of the last day of trial in this case, Bowen and Murphy had not been committed to SORTS and were awaiting a civil commitment trial to determine whether they met the criteria of an SVP. Other than these four individuals, all Plaintiffs are currently civilly committed at one of two SORTS facilities in Farmington and Fulton, Missouri.

Defendants are executives or employees of SORTS and the DMH, and all are sued solely in their official capacities.

Defendant Keith Schafer is the Director of the DMH. Defendant Mark Stringer is the Director of the DMH's Division of Behavioral Health. Defendant Richard Gowdy is the Deputy Director of the DMH's Division of Behavioral Health and the former Director of the DMH's Forensic Services. Defendant Joseph Parks is the former Chief Clinical Officer of the DMH's Office of Director. Defendant Robert Reitz is the Director of the DMH's

---

[1]     The Court explicitly excluded pre-trial detainees from the Treatment Class. (Doc. No. 197 at 9.)

Psychiatric Facilities and Chief Executive Officer of Fulton State Hospital, which houses SORTS-Fulton. Defendant Melissa Ring is the former Chief Operating Officer of Adult Psychiatric Services ("APS") at the Southeast Missouri Mental Health Center ("SMMHC"), whose responsibilities included supervision of SORTS-Farmington. Defendant Alan Blake is the former Chief Operating Officer of SORTS and is currently a SORTS consultant. Defendant Jay Englehart is the Medical Director of the SMMHC and the Director of Treatment Services for SORTS-Farmington. Defendant Julie Inman is the Regional Executive Officer of the Southeast Region of the DMH, which includes the SMMHC and SORTS. Defendant Linda Moll is the Director of Behavioral Treatment Services, APS at the SMMHC. Defendants Harold Myers and Judy Sumpter are reimbursement officers at the SMMHC. Defendant Damon Longworth is the Chief Financial Officer of the SMMHC. Defendant Donna Augustine is the Director of Social Work at the SMMHC. Defendant David Schmitt is the Chief Operating Officer of the SMMHC, and the former Quality Improvement Director of the SMMHC. Defendant Justin Arnett is the Chief Nurse Executive of the SMMHC. Defendant Marty Martin-Foreman is the Chief Operating Officer of Fulton State Hospital. Defendant Ian Fluger is the Program Treatment Coordinator of SORTS-Fulton. Defendant Sherry Lee is the Chief Nurse Executive of Fulton State Hospital. Defendant Kristina Bender-Crice is a Unit Program Supervisor at SORTS-Farmington. Defendant Erica Kempker is a former employee of SORTS-Farmington.

**Proceedings**

Plaintiffs claim that that the SVP Act on its face and as applied to the SORTS treatment program violates the Due Process Clause, and that the reimbursement sought by the state from SORTS residents also violates the Due Process Clause.[2] Plaintiffs assert two types of as-applied claims regarding treatment. First, Plaintiffs claim that particular modalities of treatment at SORTS are inadequate due to staff and funding shortages. Second, Plaintiffs claim that the entire SORTS treatment program is a sham because, in its 16 years of operation, SORTS has neither established the risk assessment and release procedures contemplated by the SVP Act, nor successfully treated and released, following such treatment, any residents back into the community.

After extensive informal and formal discovery, the Court, on December 19, 2014, granted Plaintiffs' uncontested motion to bifurcate the trial into two phases: liability and remedy. (Doc. No. 358.) An eight-day trial solely on the issue of liability was held beginning on April 21, 2015.

Four expert witnesses testified at trial. Clinical psychologist Brian Abbott, Ph.D., and licensed clinical social worker David Prescott testified for Plaintiffs. Dr. Abbott has extensive experience in developing, implementing, and reviewing treatment programs for sex offenders, and in conducting forensic evaluations of individuals civilly committed as SVPs. Prescott formerly served as Treatment Assessment Director of Wisconsin's SVP

---

[2] In this lawsuit, Plaintiffs do not challenge their initial commitment. Moreover, Plaintiffs previously asserted an alternative claim under Title II of the Americans with Disabilities Act, but they voluntarily dismissed that claim before trial.

program, and he, too, has extensive experience in developing, assessing, and providing training regarding SVP treatment programs around the country, including at SORTS. Prescott also formerly served as a board member and president of the national Association for the Treatment of Sexual Abusers ("ATSA"), and he currently serves on the board of directors of the national Sex Offender Civil Commitment Providers' Network ("SOCCPN").

Clinical psychologist Anita Schlank, Ph.D., and forensic psychiatrist Angeline Stanislaus, M.D., testified for Defendants. Dr. Schlank is the Clinical Director of Virginia's SVP civil commitment program. She has provided sex offender evaluation and treatment for approximately 30 years, formerly served as the Clinical Director of Minnesota's SVP civil commitment program, and has served as a consultant for several other SVP civil commitment programs around the country, including SORTS. She also serves on the board of directors of SOCCPN. Dr. Stanislaus is the Chief Medical Director of Adult Services for the DMH, and she oversees the two hospitals in which the SORTS facilities are housed. Dr. Stanislaus also has several years of experience in conducting forensic evaluations of civilly committed sex offenders in Illinois and has testified as an expert witness in numerous civil commitment trials.

The following findings of fact and conclusions of law are entered based on the entire record, including the trial testimony and exhibits, and the parties' post-trial briefs. As set forth below, the Court finds that Plaintiffs have proved their claims in part.

## SUMMARY OF DECISION

Missouri's SVP Act permits the state to involuntarily detain individuals outside of the criminal justice system, potentially indefinitely, under a civil commitment process

designed to protect the public from persons who suffer from severe mental abnormalities and who are dangerous.  Unlike criminal systems, which punish individuals for past criminal conduct, civil commitment systems such as SORTS involuntarily confine individuals who have in many cases already served complete prison sentences for their crimes, but who, by reason of mental illness or abnormality, are deemed likely to commit acts of violence in the future.

Where so significant a restriction of an individual's liberty is at issue, the Due Process Clause of the United States Constitution requires that the nature and duration of the confinement bear some reasonable relation to the confinement's non-punitive, civil purpose.  Thus, the state must ensure that it civilly confines individuals only so long as they are both mentally ill and dangerous.  If confinement continues beyond that time, or if it imposes restrictions that are so excessive as to indicate the forbidden purpose to punish, it becomes unconstitutional.

The evidence at trial did not establish that the SVP Act is unconstitutional in all of its applications, or that the particular treatment modalities at SORTS are so lacking as to violate the Due Process Clause.  Nor did the evidence establish that the state's reimbursement scheme is unconstitutional.  Therefore, the Court will deny relief with respect to Plaintiffs' claims challenging the SVP Act on its face, challenging the constitutional adequacy of the SORTS treatment modalities, and challenging the state's reimbursement scheme.

However, the overwhelming evidence at trial—much of which came from Defendants' own experts—did establish that the SORTS civil commitment program suffers

from systemic failures regarding risk assessment and release that have resulted in the continued confinement of individuals who no longer meet the criteria for commitment, in violation of the Due Process Clause. This case will proceed to the remedy phase to determine appropriate relief regarding these specific, as-applied constitutional deficiencies.

## FINDINGS OF FACT

### History of Missouri's SVP Act and SORTS

Twenty states, including Missouri, have enacted laws permitting the civil commitment of sex offenders. Thirty states have no such law. Missouri's SVP Act became effective on January 1, 1999. SORTS, previously known as the Sexually Violent Predator Treatment Program and later, the Missouri Sex Offender Treatment Center, opened just a few days later, on January 4, 1999.

There are now two SORTS facilities. The first was opened in 1999 at the SMMHC in Farmington, Missouri. During the first decade of its operations, no residents were released from the SORTS-Farmington facility. In mid-2009, SORTS was running out of space for residents, and began to explore options, including the development of a community alternative for the aged and infirm and the opening of group homes. Another option considered was the conditional release of 8 to 16 residents to cottages at the St. Louis Psychiatric Rehabilitation Center ("SLPRC"), a secure facility that is somewhat less restrictive than SORTS, and a group of individuals thought suitable for such release was identified. None of these options was pursued, however. Instead, in 2010, the state provided further funding which was used to expand the program at SORTS-Farmington, and to open a new SORTS facility at Fulton State Hospital in Fulton, Missouri.

Both the SMMHC and Fulton State Hospital divide their hospital space between SORTS and other divisions for mentally ill persons, including criminal sex offenders who have not been declared SVPs under the SVP Act. At the SMMHC, the non-SORTS division is known as APS. At Fulton State Hospital, the non-SORTS division is known as "Fulton Proper." The SORTS facilities in both hospitals are considered to be either maximum security or high security facilities, with razor wire fences patrolled by armed guards. There are separate wards within each of the SORTS facilities for aged and infirm residents.

In the fall of 2013, SORTS-Farmington opened a facility within its secure perimeter known as the "Annex." The Annex is a step-down unit, with space for up to eight residents, and is a somewhat less restrictive, group-home-type setting, that is behind the razor wire fence of SORTS-Farmington. There are currently five residents living in the Annex. Evidence was presented with respect to three of these residents, each of whom has obtained a court order finding that he no longer meets the criteria for commitment and is therefore entitled to conditional release.

One such resident, James Lewis, received a court order for conditional release in January, 2012, after successfully completing the SORTS treatment program. Although SORTS treatment providers recommended his conditional release, they requested that his release be "without discharge." In the absence of any facilities to accommodate such a release, Lewis remained confined in the main ward of SORTS for a little over a year, until the Annex was opened.

The other two Annex residents who obtained conditional release orders are Donald Williams and James Fennewald. Both obtained conditional release orders "without

discharge," at the request of SORTS treatment providers, in 2013 and late 2014, respectively.

Although treatment programs have been on-going at both facilities, and a number of residents have progressed through the designated treatment programs, no procedures or placement options for community reintegration have been established. Only two residents have ever been reintegrated into the community after civil commitment to SORTS, but neither was released as a result of successfully completing the treatment program.

As discussed more fully below, the two residents released into the community after commitment to SORTS were DeWayne Arthur and Ronald Gibson. Neither the DMH nor SORTS was involved in either of these releases. Arthur was civilly committed but never received treatment at SORTS. Because of Arthur's medical frailty, Missouri's Attorney General reached an agreement with Arthur's attorney to discharge Arthur to a skilled nursing facility immediately after his commitment. The DMH and SORTS were not involved in this negotiation. Gibson spent more time at SORTS, but because he was aged and suffering from dementia, he was conditionally released by a court in 2010. This release was opposed by the DMH and SORTS. Expert witnesses from both sides and Defendant Jay Englehart, M.D., Director of Treatment Services for SORTS-Farmington, all agreed at trial that neither the Arthur nor Gibson releases could be credited to the success of the SORTS treatment program. No other SORTS resident has been released into the community, and Missouri is at the bottom of SVP programs nationally in this respect.

At the time of trial, there were approximately 200 individuals confined at SORTS under the SVP Act, including several residents over the age of 65 and others who are physically infirm. Both SORTS facilities are at or near maximum capacity.

**Missouri's SVP Act**

The SVP Act defines an SVP as "any person who suffers from a mental abnormality which makes the person more likely than not to engage in predatory acts of sexual violence if not confined in a secure facility" and who has either (a) pled guilty, been found guilty, or been found not guilty by reason of mental disease or defect of a sexually violent offense; or (b) has been committed as a criminal sexual psychopath pursuant to another Missouri statute. Mo. Rev. Stat. § 632.480(5).

Among sex offenders, individuals civilly committed as SVPs are considered to pose the highest risk of sexually reoffending. However, evidence was credibly presented that recidivism rates for sex offenders generally may be overstated.[3]

When a prisoner found guilty of a sexually violent crime is suspected of meeting the criteria of an SVP, the agency with jurisdiction provides notice to Missouri's Attorney General within 360 days prior to the prisoner's release. *Id.* § 632.483. The person is then evaluated by a prosecutors' review committee and a multidisciplinary team established by

---

[3] For example, a 2013 review of Florida's SVP program authored by one of Defendants' experts, Dr. Schlank, reported that the recidivism rate for released Florida SVPs was only 3.6%. (Pls.' Ex. 131 at 23.) Dr. Schlank and one of Plaintiffs' experts, Dr. Abbott, both testified that persons civilly committed under Florida's SVP program are similar in diagnoses and dangerousness to persons committed under Missouri's SVP Act. Plaintiffs also presented evidence of at least some statistics showing that sex offenders have the lowest rates of recidivism among five categories of felony offenders in Missouri, and that the rate of recidivism drops dramatically as sex offenders age beyond 60 years.

Missouri's Department of Corrections ("DOC"), which includes psychiatrists and psychologists from both the DOC and the DMH, to assess whether the person meets the definition of an SVP. *Id.* If the prosecutors' review committee determines by a majority vote that the person meets the definition of an SVP, the Attorney General may file a petition in the probate division of the circuit court alleging that the person is an SVP, stating sufficient facts to support such an allegation, and also attaching a copy of the multidisciplinary team's assessment. *Id.* § 632.486. The court then holds a hearing to determine whether there is probable cause to believe that the person is an SVP, and if so, the person is held in secure custody until the time of trial. *Id.* § 632.489. The person has the right to counsel at the probable cause hearing and at trial. *Id.* §§ 632.489-632.492.

If at trial, the court or a jury by unanimous verdict determines "by clear and convincing evidence" that the person is an SVP, the person is "committed to the custody of the director of the [DMH] for control, care and treatment until such time as the person's mental abnormality has so changed that the person is safe to be at large." *Id.* § 632.495.2. The SVP Act provides that civilly committed persons "shall be kept in a secure facility designated by the director of the [DMH] and such persons shall be segregated at all times from any other patient under the supervision of the director of the [DMH]." *Id.* § 632.495.3.

Once a person has been civilly committed under the SVP Act, the director of the DMH or his "designee" must evaluate the person's "mental condition" once a year, and must provide the "yearly report" to the court that committed the person. *Id.* § 632.498.1. However, nothing in the SVP Act prohibits or prevents the DMH from providing more frequent updates to the court.

There are two methods by which a person civilly committed as an SVP may obtain release. First, the director of the DMH must provide committed persons with an annual written notice of the person's right to petition the court for release over the director's objection.[4] *Id.* § 632.498.2. But petitions filed without the director's approval are subject to heightened requirements. For example, "[u]pon receipt of a first or subsequent petition from committed persons without the director's approval, the court shall endeavor whenever possible to review the petition and determine if the petition is based on frivolous grounds and if so shall deny the petition without a hearing." *Id.* § 632.504. Moreover, if a petition filed without the director's approval has been found to be frivolous or has been previously denied, the court must deny any subsequent petition "unless the petition contains facts upon which a court could find the condition of the petitioner had so changed that a hearing was warranted." *Id.*

If a petitioner filing for release without the director's approval survives the frivolity review, he is then subject to the requirements of § 632.498. Under § 632.498.4, the court first holds a hearing at which the petitioner bears the burden to demonstrate by a "preponderance of the evidence," that he "no longer suffers from a mental abnormality that makes [him] likely to engage in acts of sexual violence if released." *Id.* § 632.498.4. If a petitioner can make this threshold showing, the court will set a trial on the issue. At trial, the burden of proof shifts to the state to show by clear and convincing evidence that "the committed person's mental abnormality remains such that the person is not safe to be at

---

[4]    The director must forward the notice, and a waiver form, to the court with the annual report. Mo. Rev. Stat. § 632.498.2.

large and if released is likely to engage in acts of sexual violence." *Id.* § 632.498.5(3). If the state fails to meet this burden, the person is entitled to conditional release. *Id.*

The second method by which a person civilly committed as an SVP may obtain release is by obtaining director authorization. "If the director of the [DMH] determines that the person's mental abnormality has so changed that the person is not likely to commit acts of sexual violence if released, the director *shall* authorize the person to petition the court for release." *Id.* § 632.501 (emphasis added). Director-authorized petitions are not subject to a frivolity review. Section 632.501 provides that "[t]he hearing and trial, if any" for director-authorized petitions "shall be conducted according to the provisions of section 632.398." *Id.*

The uncontroverted testimony at the bench trial in this case suggested that the court proceedings would be more streamlined for director-authorized release petitions. This result is perhaps supported by the language "if any" in § 632.501.

Section 632.505 of the SVP Act, governing conditional release, provides:

> Upon determination by a court or jury that the person's mental abnormality has so changed[5] that the person is not likely to commit acts of sexual violence if released, the court shall place the person on conditional release pursuant to the terms of this section. The primary purpose of conditional release is to provide outpatient treatment and monitoring to prevent the person's condition from deteriorating to the degree that the person would need to be returned to a secure facility designated by the director of the [DMH].

*Id.* § 632.505.1. This section requires the DMH to "develop a conditional release plan which contains appropriate conditions for the person to be released," and which addresses

---

[5] As discussed *infra* p. 47, the statute has been construed by the Missouri Supreme Court to require both a mental abnormality and dangerousness for continued commitment. *See In re Care & Treatment of Coffman*, 225 S.W.3d 439, 446 (Mo. 2007); *Murrell v. State*, 215 S.W.3d 96, 104 (Mo. 2007).

the "person's need for supervision, counseling, medication, community support services, residential services, vocational services, and alcohol and drug treatment." *Id.* § 632.505.2.

The DMH must submit the proposed plan for conditional release to the court. *Id.* The reviewing court then determines the conditions that it "deems necessary to meet the person's need for treatment and supervision and to protect the safety of the public." *Id.* § 632.505.3. Section 632.505 lists 21 conditions to which conditionally released persons "shall be subject," such as maintaining a residence approved by the DMH; not having contact with any child without specific approval by the DMH; not consuming alcohol or controlled substances; not leaving the state without permission of the DMH; and submitting to electronic monitoring, which may be based on technology that identifies and records a person's location at all times. *Id.* This section also permits the court to add other conditions that it deems "necessary to meet the person's need for treatment and supervision and to protect the safety of the public." *Id.* However, the section also provides that the court "may modify conditions of release upon its own motion or upon petition of the [DMH], the [DOC], or the person on conditional release." *Id.* § 632.505.6. Moreover, although conditionally released persons may have to maintain a residence approved by the DMH, they are not required to be segregated from other mental health patients. *Id.* § 632.495.3.

Individuals civilly committed to SORTS may also have to reimburse the state for any care and treatment provided by the DMH. Missouri Revised Statutes § 630.205.1 provides that a "person receiving services and the person's estate, spouse, parents, if the person is a minor, and any fiduciary or representative payee holding assets for the person . . . are jointly and severally liable for the fees for services rendered to the person by a residential

facility[.]"  *Id*. § 630.205.1.  The director of the DMH determines the "maximum amount for services which shall be charged in each of the residential facilities" and applies a "standard means test" in determining the amount to be charged.  *Id.* § 630.210.1.  The SVP Act also provides that conditionally released persons may be required to pay "fees to the [DMH] and the [DOC] to cover the costs of services and monitoring," as a condition of release.  *Id.* § 632.505.3(18).  However, the reimbursement provisions state that "[n]o person who is domiciled in Missouri shall be denied services from a [DMH] facility because of an inability to pay for such services on the part of the individual, the spouse, or the parents."  *Id.* § 630.205.4.

**SORTS Treatment Program**

SORTS has historically maintained a vision and mission of "no more victims," and at one point, the SORTS treatment manual stated that residents were to remain in the custody of the DMH until it was determined that the resident "will not engage in acts of sexual violence if discharged."  (Pls.' Ex. 123 at 40.)  These statements, which essentially require a complete absence of risk before a resident will be released, are inconsistent with the SVP Act's requirements.  They are also unrealistic.  Evidence was credibly presented that no adult male has a 0% risk of committing an act of sexual violence.

Both SORTS-Farmington and SORTS-Fulton are accredited, as part of their respective hospitals, pursuant to the Joint Commission on Accreditation of Healthcare Organizations, also known as the "Joint Commission."  The SMMHC, including SORTS-Farmington, passed the Joint Commission's survey performed in 2012, which reviewed,

among other things, the facility's staffing levels, treatment standards, security, and emergency preparedness.

SORTS also strives to adhere to national guidelines published by ATSA for the assessment, treatment, and management of male sexual abusers. These guidelines recommend that confinement and treatment may be necessary for a small group of chronic, violent, or predatory offenders; that sexual predator assessments should be conducted using empirically validated risk assessment instruments and measures; that civil commitment should be reserved for sex offenders who are found to pose the highest threat to public safety; that civil commitment should be viewed as one part of a comprehensive continuum of responses to sexual offending behavior; that treatment should be consistent with current research and professional standards and should reflect an individual's qualifying mental disorders, relative risk, and needs; and that treatment should be assessed each year to evaluate progress. (Defs.' Ex. S.)

If SORTS residents consent to treatment, an individualized treatment plan is developed for them, and it is updated annually. Treatment teams consist of a psychiatrist, a medical doctor, a psychologist, a social worker, a nurse, a unit manager, a recreational or vocational therapist, and a security aide. Treatment teams meet weekly to discuss progress of each resident and to adjust treatment plans as needed.

There are two types of SVP treatment provided to SORTS residents. SORTS-Farmington residents primarily receive Cognitive Behavioral Therapy ("CBT"). The CBT model was built on the idea that dysfunctional behavior is a result of dysfunctional thoughts. Therefore, CBT treatment focuses on changing residents' way of thinking. The CBT

program offers residents six to eight hours per week of sex-offender-specific process groups, also known as core groups, to address dynamic risk factors associated with sexual offenses.  These core process groups are led by either psychologists with doctoral or masters' degrees, or licensed social workers or counselors.  There are on average eight residents per group.  Residents are also offered two hours of psychoeducational groups per week.  Finally, individual psychotherapy is provided on a case-by-case basis, depending on the needs of the individual resident.

SORTS-Fulton residents primarily receive Safe Offender Strategies ("SOS") treatment.  The SOS program was introduced to SORTS-Fulton in 2012, as an option for SORTS residents who were resistant to treatment under the CBT model, including some intellectually disabled residents.  The SOS program has been used in the non-SORTS Fulton Proper division of Fulton State Hospital since 2007.  One ward at SORTS-Farmington has also recently begun providing SOS treatment.

The SOS model was built on the idea that dysfunctional behavior is the result of an individual's emotional dysregulation, or poor response, to particular stressors.  SOS treatment therefore focuses on identifying the stressors leading to an individual's dysregulation, and equipping the individual with the skills he needs to recognize and respond more appropriately to those stressors.  Like CBT, SOS also relies primarily on group therapy intervention, and each resident receives eight to ten hours per week of group therapy.  SOS groups meet two times per week to discuss and practice the concepts and strategies in the SOS treatment manual.  Moreover, residents in the SOS program are offered once-a-week self-monitoring groups and behavioral analysis groups to address self-

monitoring practices and treatment-related problem behaviors, respectively.  Finally, the

SOS program offers psychosexual rehabilitation therapy, which includes groups addressing

self-regulation, anger management, life skills, substance abuse, and restorative justice.

The guiding principle for both treatment programs is the risk-needs-responsivity

("RNR") principle.  The RNR principle helps SORTS staff plan treatment in response to a

patient's learning style and risk factors.  The risk principle suggests that offenders at higher

risk for reoffending will benefit most from higher levels of intervention, including high-

intensity treatment.  The needs principle suggests that only those facts associated with

reductions in recidivism should be targeted in intervention.  The responsivity principle

suggests that the treatment program should be matched to individual patient characteristics.

The ATSA guidelines support the use of RNR-based treatment.

Both the CBT and SOS treatment programs are organized into phases of

indeterminate length.  The CBT program used at SORTS-Farmington has four phases.

Phase I focuses on pre-engagement and engagement; Phase II on cognitive restructuring;

Phase III on emotional integration; and Phase IV on community reintegration.  The CBT

program also employs color-coded patient levels based on similar concepts:  Grey – pre-

engagement, meaning that the patient is not interested in change or treatment; Red – pre-

recognition, meaning that the patient does not recognize that there is a problem or does not

feel that he needs treatment; Yellow – recognition, meaning that the patient sees that he has

some problems but is not fully committed to addressing them; Blue – planning I, meaning

that the patient is making a decision about how to enter treatment and generally attends and

participates in treatment; Green – planning II, meaning the patient is making a decision

about how to focus his treatment and generally attends and participates in treatment; Purple – action, meaning that the patient is actively working in treatment and has made progress; and Gold – maintenance, meaning that the person is fully self-managing or is ready for self-management. The SOS program, used primarily at SORTS-Fulton, has seven stages that correspond roughly with the color-coded patient levels discussed above: Stage 1 – pre-engagement; Stage 2 – pre-recognition; Stage 3 – recognition; Stages 4 and 5 – planning; Stage 6 – action; and Stage 7 – maintenance.

Residents in both programs may move up and down between levels as they progress or regress in treatment. The evidence demonstrated that the number of sex-offender-specific treatment hours offered by SORTS and the utilization of a phased treatment system are consistent with the standards of other SVP treatment programs.

SORTS has historically suffered from staffing and budget shortages, resulting in group cancellations. These deficiencies were reviewed in another case in this District, but were found in 2010 not to render treatment at SORTS so lacking as to violate the Constitution. *Strutton v. Meade*, No. 4:05CV02022 ERW, 2010 WL 1253715 (E.D. Mo. Mar. 31, 2010). The bulk of the evidence presented by Plaintiffs regarding their claim that treatment modalities at SORTS are inadequate was evidence from this pre-2010 timeframe.

By contrast, Defendants' evidence established that SORTS has improved its treatment programs since 2010, and many aspects of the SORTS treatment programs now conform to accepted standards in the field of residential sex offender treatment. Dr. Schlank testified that the level of staffing at the SORTS facilities is now adequate and exceeds the level of staffing at the SVP program in Virginia, and Plaintiffs offered little contrary

evidence.  The evidence also established that treatment groups are now rarely, if ever, canceled.  Finally, as a result of changes made in the last year, SORTS treatment programs no longer focus on consequences for minor rule violations.  Under previous clinical directors, even minor infractions could affect a resident's progression through the levels of treatment.  But SORTS changed this protocol in 2014, and it now focuses on treatment-related behaviors in evaluating treatment progress.

Treatment participation rates at SORTS are high, with approximately 97% of residents participating.  The stated goal of both treatment programs is to treat and safely reintegrate committed individuals back into the community.

Defendants' own expert and DMH executive, Dr. Stanislaus, testified that, although she believes treatment at SORTS is adequate, progression through the various levels of the SORTS treatment programs is tortuously slow.   Less than 5% of SORTS-Fulton residents have reached Stage 6 of the SOS treatment program, and none has reached Stage 7.  Some residents at SORTS-Farmington, which has been open much longer, have progressed further in treatment.  Approximately 31 residents have reached the second-highest Purple level, and 8 residents have reached the highest Gold level.  Notwithstanding the progress of these residents in treatment, none has been reintegrated into the community as the treatment manual envisions, and no procedures or placement options for community reintegration have been established.

Though testifying for Defendants, in Dr. Schlank's opinion, SORTS' lack of clear guidelines for treatment completion or projected timeframes for phase progression impedes the motivation of committed individuals to participate meaningfully in treatment for

purposes of reintegration into the community.  Dr. Schlank testified that other SVP programs that are more successful in releasing residents back into the community, such as the Virginia SVP program for which she serves as Clinical Director, have established clear timeframes within which, if residents consistently demonstrate all behavioral goals within a phase, residents will progress to the next phase of treatment.  Establishing such timeframes provides clarity to residents and staff, instills hope in residents, guards against treatment providers' unconscious biases, and avoids "raising the bar" for release.

The evidence also established that there are several other areas for improvement in the SORTS treatment programs.  These include increasing communication and coordination between SORTS-Farmington and SORTS-Fulton, adapting treatment program materials to meet the needs of developmentally disabled residents, and maintaining consistency in treatment protocols.

**SORTS Risk Assessment**

A licensed doctoral level psychologist employed by SORTS performs the annual assessments of the mental condition of SORTS residents, also known as annual reviews, which, as noted above, are required by the SVP Act.  The person who conducts these assessments—the annual reviewer—is not part of the resident's treatment team.  Rather, each SORTS facility is assigned one annual reviewer for all residents.   The SORTS annual reviewers previously did not interview the residents as part of their review, but in light of ATSA guidelines recommending such interviews, the annual reviewers began conducting resident interviews sometime within the last year.

The annual reviewers most commonly use the Static-99R as an actuarial risk assessment tool. The Static-99R is a risk assessment tool that measures static factors, which are generally unchangeable in nature, such as the individual's prior sexual offenses. Only recently—just a few months before trial began in this case—did SORTS begin training its annual reviewers on non-static instruments used to objectively assess progress in treatment, such as the Sex Offender Treatment and Progress Scale ("SOTIPS"). No empirical research has been conducted as to the accuracy of SOTIPS, and it has not been studied in connection with SVP residents. Dr. Stanislaus acknowledged that it will take at least two more years before SORTS can assess the usefulness of SOTIPS as a dynamic risk assessment tool.

Every annual review performed by SORTS and submitted to the courts includes a forensic opinion, meaning that the reviewer applies his or her professional opinion about the mental condition of the SORTS resident to the provisions of the SVP Act. Though not required by the statute, the annual reviewers also make a recommendation regarding whether the person continues to meet the statutory criteria for civil commitment.

The evidence established that these annual reviews are the primary tool that courts use to evaluate whether a civilly committed person continues to satisfy the criteria for commitment, or instead, whether the person should be conditionally released. Several witnesses, including Susan Elliott and Charles Banks, both Missouri public defenders in the civil commitment defense unit, credibly testified that it is nearly impossible to successfully petition for conditional release without an annual review from SORTS recommending such release. Corroborating this testimony was the evidence that, in the 16 years since the SVP

Act was enacted, only two SORTS residents have been released without the support of a SORTS annual review, one of whom was never treated by SORTS.

Notwithstanding the importance of these annual reviews, the annual reviewers at both SORTS-Farmington and SORTS-Fulton receive no legal training in understanding or applying the SVP Act's criteria for conditional release. As a result, they have misunderstood and been confused about how to apply the statutory criteria. Even Defendants' expert, Dr. Schlank, concluded that that the annual reviewer at SORTS-Fulton did not know how to apply the statutory criteria for risk assessment. For example, Dr. Schlank stated in her expert report that in an interview with him, the SORTS-Fulton annual reviewer[6] indicated that he believed he could not recommend a resident for conditional release "even if a resident appeared to present little to no risk of sexual reoffending" unless he could testify that the resident's "mental abnormality had significantly changed." (Pls.' Ex. 3 at 6.) The SORTS-Fulton annual reviewer also indicated that he was unsure whether two years of "consistent, positive behavior" by a resident was a long enough period of time to indicate that the residents' mental abnormality had changed. *Id.* Dr. Schlank concluded that if SORTS annual reviewers addressed "the question of whether there is a continued need for secure, inpatient treatment rather than whether a mental abnormality has changed, . . . Missouri [would] be much more successful in the conditional release of clients into the community." (Pls.' Ex. 3 at 5.)

Likewise, the annual reviewer at SORTS-Farmington, psychologist Sujatha Ramesh, Ph.D., admitted that she has not received any legal training or guidance regarding how to

---

[6]     The SORTS-Fulton annual reviewer did not testify at trial.

interpret the SVP Act. And although she has a doctorate degree in counseling psychology, she is not a forensic psychologist. Thus, Dr. Ramesh provides a forensic opinion in her annual reviews based solely on her own interpretation of the SVP Act's criteria for conditional release, including her own reading and understanding of Missouri Supreme Court caselaw interpreting the SVP Act.

Dr. Stanislaus, too, admitted that the SORTS annual reviewers do not understand and consistently apply the legal standards for risk assessment under the SVP Act. Dr. Stanislaus testified that her goal, at some unspecified point in the future, is to get the annual reviewers from both facilities together and to develop a unified clinical interpretation of the SVP Act's risk assessment criteria. However, at the time of trial, no such training had taken place.

The evidence also established that the annual reviews at SORTS fail to include highly relevant information, such as the opinions of SORTS treatment providers regarding residents' lowered risk and potential for conditional release.

As early as June of 2009, Defendant Schafer, Director of the DMH, discussed the possibility of selecting 16 aged and infirm SORTS residents and developing a community alternative for these residents as a cost-saving measure. (Pls.' Ex. 88.) Around the same time, Director Schafer emailed others within DMH and the Governor's office to "think about five or six cluster group homes on the SE Missouri Mental Health Center campus that would allow us to move elderly and medically frail [SORTS] patients to a different level of care." (Pls.' Ex. 89 at 2.) The email noted that SORTS just had an 82-year old resident die from his medical condition. *Id.* Likewise, Defendant Alan Blake, former Chief Operating

Officer of SORTS, exchanged several emails with other SORTS and DMH officials regarding whether some residents could be transferred out of SORTS in 2009.

These emails were sent because SORTS was running out of space for residents, and the DMH was not sure whether money from the state would be available to expand SORTS to meet capacity needs. The evidence established that Blake and others at this time considered moving residents who were aged or infirm out of SORTS and to skilled nursing facilities. *See, e.g.*, Pls.' Exs. 80 & 88. SORTS had, at the time, 15 residents who were 65 or older. (Pls.' Ex. 80.) In one email, Blake identified six residents who could be transferred to a skilled nursing facility, and in another email, Blake identified nine "definitely medical fragile" residents for transfer who needed "ongoing nursing / physician attention," but stated that some of the nine "if in the community, still need to be in a locked or controlled nursing care facility, even though they have limited physical ability to move about." (Pls.' Exs. 90 & 93.)

Another option discussed in these 2009 emails was to conditionally release 8 to 16 residents to less restrictive cottages at the SLPRC. (Pls.' Ex. 80.) Blake and others at SORTS and the DMH believed that releasing residents to cottages at SLPRC would save the state money, and would also be "the right thing to do," since it would "create a discharge option" for SORTS residents. *Id.* In these emails, Blake stated that SORTS had a pool of at least 24 residents, some of whom are identified in the emails by name, who were candidates for conditional release to such cottages; that the "top five" of these residents "could go today to the SLPRC setting" and easily pass the "neighbor test"; and that the rest "may need

greater support / treatment, but don't represent a risk to the community in terms of compliance and appreciation of their situation."  (Pls.' Ex. 79.)

Blake believed that the individuals identified in the emails as candidates for transfer to the SLPRC cottages presented a lower risk than other SORTS residents.  Blake also testified that his reference to the "neighbor test," although not a clinical or scientific term, meant that people would have been comfortable having these individuals as neighbors in the SLPRC setting, even knowing their background.  However, Blake noted that the conditional releases may not have been approved unless more security accommodations, such as fences, were added to the cottages.  In any event, the proposed conditional release of residents to SLPRC cottages or to skilled nursing facilities was not implemented because, as discussed above, SORTS received more money from the state in 2010 to open SORTS-Fulton and to expand SORTS-Farmington.

The residents identified in these emails as presenting a lower risk, due to their treatment progress or their age and infirmity, were not informed that SORTS officials had identified them as candidates for conditional release.  Nor was their lower risk mentioned in their annual reviews in 2009, including annual reviews written by Blake just days after he sent these emails.  Rather, the annual reviews of these residents in 2009, and for years thereafter, stated that the residents continued to meet the criteria for commitment and should not be conditionally released.  Defendants' expert, Dr. Stanislaus, admitted that the sort of information contained in the emails discussed above, regarding the lowered risk of certain residents, should have been included in the residents' annual reviews.

Four of the residents identified as candidates for conditional release to the cottages were ultimately conditionally released, but not until three or four years later and not to cottages but to the Annex. Four of the aged and infirmed residents identified as candidates for conditional release to a skilled nursing facility died while still confined at SORTS.

**Director Authorization for Release**

The director of the DMH has not authorized a single SORTS resident to petition for conditional release in the 16 years since the SVP Act was enacted, even though SORTS treatment providers and annual reviewers have found several residents to meet the statutory criteria for conditional release.

The evidence established that the process to obtain director authorization for conditional release petitions is unduly lengthy and laden with unnecessary procedures. Blake acknowledged that in 2010—a decade after the SVP Act was enacted—the DMH had not developed clear procedures for obtaining director approval for a conditional release petition. Blake sent at least two proposals for director approval as early as 2010 for individuals he believed met the criteria for conditional release into the community, and for whom he submitted annual reviews so stating. However, the director of the DMH did not approve either of these petitions for conditional release. One of the individuals was Donald Williams, who, as more fully discussed below, eventually filed a petition for conditional release over the director's objection and obtained a conditional release order in 2013. And notwithstanding the conditional release order, Williams still resides in the Annex, behind the secure perimeter of SORTS.

In 2011, the DMH finally adopted a policy for obtaining director approval, but this policy established at least three levels of approval within the DMH before the director would even consider authorizing a resident's petition for conditional release. Dr. Englehart admitted that he is not sure how long it would take to get through all three steps for director approval because it has never been done.

Only once in 16 years has a resident gotten past the first step of the three-step process for director approval. This was Michael Allison, who undisputedly met the statutory criteria for conditional release, and who received an annual review recommending his conditional release in December 2014. Rather than filing a petition for conditional release over the director's objection and subjecting his client to the two-step process to receive a trial, Allison's public defender requested that the director of the DMH comply with Missouri Revised Statutes § 632.501 and authorize Allison to petition for conditional release. However, it took months to get to the final level of the self-imposed three-level process, and then the process was stalled indefinitely because one official in the chain—a facility director—was out of the office due to a family emergency. Dr. Englehart testified that when the process for director approval for Allison got "stuck" because the facility director was out of the office, no one was sure how to "unstick" it. Accordingly, as of the date of trial, several months after SORTS' own annual reviewer and treatment providers declared that Allison met the criteria for conditional release, the director of the DMH still had not authorized Allison to petition for conditional release, and Allison was still confined in maximum security conditions at SORTS.

Further, if a resident files a petition for conditional release without director approval, even if SORTS annual reviewers and officials support the petition, the DMH—for reasons that were not explained—halts the process to obtain director approval altogether. There has been some discussion at the DMH of speeding up the process for director approval, but as of the date of trial, no such changes had taken place.

**The Annex and Conditional Releases**

In the fall of 2013, several years after this lawsuit was filed, SORTS-Farmington opened the Annex. The Annex is designed for residents in the last phase and highest level of treatment, to help them develop the skills that they will need to cope and progress in the community. Annex residents share a living area, kitchen, and bedrooms; cook a weekly meal on their own; and are eventually able to earn passes to go on escorted or unescorted trips outside the facility. However, the Annex is behind the razor wire fence of SORTS-Farmington.

The three Annex residents discussed at trial who have obtained conditional release orders did so over the objection of the director of the DMH, but with the support of SORTS annual reviewers. Their orders of conditional release were obtained after a preponderance hearing and then a full trial, in which a court or jury found that they are no longer likely to commit acts of sexual violence if released—i.e., that they no longer meet the criteria for civil commitment. However, at the request of the DMH, the orders added the condition that the release is "without discharge" from SORTS and that the residents must reside at the Annex indefinitely. Some of these residents are permitted to leave the secure perimeter of the Annex during the day, either unescorted or accompanied by SORTS security staff, to

work at jobs in the community, to go grocery shopping, or to simply walk around the perimeter of SORTS-Farmington, outside the razor wire fence. However, all residents return to the Annex at night. SORTS-Fulton does not currently have a step-down unit such as the Annex, but evidence was presented that the DMH plans to develop an Annex-like facility at SORTS-Fulton in the future.

Experts for both sides in this case agreed that "conditional release," in the context of similar SVP civil commitment programs around the country, means that the treated patient actually lives in the community. Moreover, the evidence established that the Annex cannot be considered a least restrictive alternative ("LRA") as that term is understood by SVP civil commitment programs in other states because residents still live in a high-security setting, behind a razor wire fence, and are not integrated into the community.

Dr. Schlank testified that a step-down unit such as the Annex is ideal to ease residents' transition from institutionalization to release, and that she wished the Virginia SVP program had such a step-down unit. Likewise, Plaintiffs' expert Prescott acknowledged that a step-down unit inside a secure facility is a "good start" to the release process.

The problem, however, is that residents get stuck in the Annex, and never complete the transition to release. By contrast, Dr. Schlank's SVP program in Virginia has successfully treated and conditionally released more than 100 residents from its SVP civil commitment program into the community. The average commitment time prior to release in Virginia was at one time 54 months and may have decreased since then. Likewise, Wisconsin's SVP program, for which Prescott previously served as Treatment Assessment

Director, had successfully treated and conditionally released approximately 150 residents into the community as of 2014.  Both the Virginia and Wisconsin programs have departments devoted to actively managing conditional releases into the community, including developing community resources and contracting with community service providers.  SORTS has no such department or staff dedicated to release into the community.

Experts from both sides, as well as SORTS officials, acknowledged that SORTS residents are similar to persons civilly committed under SVP statutes in other states, including Virginia and Wisconsin.  Yet, with the exception of two residents who, as discussed above, were released with no involvement or support from SORTS or the DMH, SORTS has not conditionally released a resident into the community in 16 years.

Moreover, neither SORTS-Farmington nor SORTS-Fulton has an LRA option outside the secure perimeter and/or in a community setting.  The evidence established that there are residents at SORTS, including some in the Annex, who could be safely placed in the community or in a less restrictive facility outside the secure perimeter of SORTS.  These include aged and infirm residents, as well as residents who have successfully completed all treatment phases within the SORTS facilities.  Blake admitted that SORTS and DMH officials have known of the need to look for community housing options since at least 2009 or 2010, by which time Blake had already identified candidates for conditional release into the community.  Blake further admitted that, while he was Chief Operating Officer of SORTS, he made several proposals to the DMH for community housing options for conditionally released residents but that he was told that such options would not be included in the state budget.  Every year since then, SORTS has requested money to be placed in the

state's budget for establishing cottages in the community, in order to implement the community reintegration phase of both SORTS treatment programs. However, the Governor of Missouri has never included such budget requests in his proposals to the state legislature and has not done so this year.

Like treatment, the "conditional release" process at SORTS is organized into phases. Specifically, there are 11 steps to the conditional release process at SORTS: Step 1 – unlimited ground pass inside the secure perimeter; Step 2 – escorted ground pass outside the secure perimeter; Step 3 – escorted community trips; Step 4 – unescorted ground pass outside the secure perimeter; Step 5 – employment; Step 6 – unescorted community trips of one hour; Step 7 – community support plan; Step 8 – up to 12-hour day trips with security personnel supervision inside St. Francois County, Missouri; Step 9 – up to 6-hour day trips with DMH transport outside of St. Francois County; Step 10 – up to 48-hour visits with security personnel supervision in and out of St. Francois County; and Step 11 – up to 96-hour visits with security personnel supervision in and out of St. Francois County.

Dr. Englehart admitted that, according to even the most recent SORTS treatment manual, it should take a resident approximately 12 to 18 months to progress through all of the steps from conditional release "without discharge" to conditional release "with discharge" into the community. But in reality, no conditionally released SORTS resident has been discharged into the community within that timeframe—or at all.

For example, Lewis was the first SORTS resident to successfully complete treatment and obtain a conditional release order, in January, 2012. At the time of his conditional release hearing, Defendant Blake represented to the court that Lewis's transition to full

release into the community would take approximately 12 to 18 months to complete. However, at the time of trial—more than three years after Lewis was found to no longer meet the criteria for commitment—Lewis still resided at the Annex, within the secure perimeter of SORTS. Although evidence was presented that beginning in 2014, two years after obtaining a conditional release order, Lewis was allowed to obtain a job and spend some unescorted time working in the community during the day, he returned to SORTS at night. There was testimony that SORTS has been looking for housing within the community for Lewis, but as of the date of trial in this case, no such housing had been found.

Likewise, two other Annex residents, Williams and Fennewald, have obtained conditional release orders. These residents are permitted to spend some escorted or unescorted time outside of SORTS but must return to the Annex at night. SORTS also temporarily suspended Williams from his limited unescorted trips because of a rule violation (Williams had a facility phone on an unescorted pass and used the phone to call his family). But Williams's privileges were restored, according to Defendants, after he cooperated in treatment and used his risk management plan to process the violation.

Finally, another SORTS resident, Tim Donaldson, obtained a conditional release order but does not reside in the Annex. Donaldson was conditionally released "without discharge" over the director of the DMH's objection but with the support of SORTS annual reviewers in May 2013. Despite the court's finding that he no longer met the criteria for commitment, Donaldson remained confined at SORTS and was still required to wear leg restraints. Following a disagreement between Donaldson and his probation officer

regarding whether he would be able to spend time with his grandchildren—a permitted condition of his conditional release order—SORTS suspended some of the limited freedoms Donaldson had been granted, such as escorted walks outside the secure perimeter of SORTS. Even a year after Donaldson's "conditional release," the most freedom Donaldson had was to go on one-hour walks, escorted by a guard, outside the perimeter of SORTS, and he had not been allowed into the community. Donaldson's public defender, Susan Elliott, testified that these restraints upset and angered Donaldson because he felt proud that he made it through the treatment program, which he took seriously, and he felt that the restrictions were unwarranted.

Then, in May 2014, SORTS personnel found that Donaldson acted out inappropriately in treatment, and subsequently moved Donaldson away from the Annex and back to another secure ward of SORTS-Farmington, moved Donaldson back a patient level, and also suspended Donaldson from treatment. SORTS did not seek court approval before making these changes. Elliott filed a motion to modify Donaldson's conditions of release because she did not believe that SORTS could make these changes unilaterally, and because she also believed that Donaldson should be released into the community. The court found that the DMH could not force Donaldson to live at SORTS indefinitely after his conditional release and directed Elliott to draft an order that included a plan for Donaldson's release into the community within 90 days. Shortly thereafter, the DMH moved to revoke Donaldson's conditional release.

At a hearing in January 2015, the court rejected the state's petition to revoke Donaldson's conditional release, finding that Donaldson's failure to participate fully in

treatment may have violated a condition of his release but was insufficient to revoke Donaldson's conditional release. (Pls.' Ex. 114.) The court further found that "reasonable efforts to implement the previous order have not been undertaken by the State," ordered the DMH to conditionally release Donaldson by June 8, 2015, and ordered the DMH to find suitable housing for Donaldson to effect this conditional release. *Id.* Elliott testified that the court indicated at the hearing that "conditional release" meant that Donaldson should be released into the community. But as of the date of trial, the DMH had not complied with the court's order, and no effort had been made to release Donaldson into the community. Donaldson still remained confined at SORTS-Farmington, in a maximum security setting, and had not even been returned to the Annex.

Each of the so-called conditionally released residents discussed above—Lewis, Williams, Fennewald, and Donaldson—appears on the list prepared by Blake in 2009 as a resident who could be moved to a less restrictive setting at SLPRC, and Blake testified at trial that three of them—Lewis, Williams, and Donaldson—could have passed the neighbor test in 2009.

It is important to note that none of the witnesses at trial suggested that individuals civilly committed as SVPs could not successfully be treated. To the contrary, Defendants' witnesses believed that SORTS is, in fact, capable of providing effective treatment. And nearly every witness to testify agreed that conditional release into the community is part of treatment. Indeed, community reintegration is the last phase of both SORTS treatment programs, and the SORTS treatment manual explicitly contemplates community housing like cottages or apartments outside the secure perimeter. Yet Dr. Englehart and the Chief

Operating Officer of SORTS, Defendant Schmitt, both admitted that, as of the date of trial, SORTS still had no plans or procedures in place for releases—conditional or otherwise—into the community.

In the words of Defendant's own expert, Dr. Schlank, "the failure [of SORTS] to discharge clients is a significant problem, and there appears to be both some systemic difficulties and some characteristics of the program which may contribute to the failure to be released into the community."  (Pls.' Ex. 3 at 3.)  Dr. Schlank acknowledged that "[w]hile much about the Missouri SVP program is quite consistent with components of other SVP programs, it is concerning that in fifteen years no client has been conditionally released into the community.  This fact has led to a sense of hopelessness, not only in clients, but also in staff."  *Id*. at 4.  Likewise, Defendants' other expert, Dr. Stanislaus, admitted that the ATSA guidelines, on which she based her opinion that treatment at SORTS was adequate, do not support the length of time that Missouri keeps individuals waiting for release into the community.

Director Shafer foresaw these sentiments in an internal email sent in 2009, a decade after SORTS was created, in which he stated that "[n]o one has ever graduated from [SORTS] and somewhere down the line, we have to do that or our treatment processes become a sham."  (Pls.' Ex. 89 at 3.)  Likewise, Dr. Fluger, the Program Coordinator at SORTS-Fulton, admitted that if no one is released from an SVP civil commitment treatment program into the community within 10 years, the "logical conclusion" is that treatment is a "sham."

Missouri is at the bottom of SVP programs nationally in terms of conditional releases into the community, and other states successfully release many more persons into the community. And even Missouri successfully treats and releases non-SORTS sex offenders with similar, but not identical, diagnoses and offense histories as individuals civilly committed as SVPs. For example, psychologist and co-developer of the SOS treatment program, Jill Stinson-McKnight, Ph.D., testified that as of 2012, approximately 95 of the 150 non-SORTS residents that received treatment under the SOS program in Fulton Proper were successfully released into the community with promisingly low recidivism rates. These residents were not determined to be SVPs under the SVP Act, but at least some had been confined pursuant to Missouri's now-repealed Criminal Sexual Psychopathic Law. Similarly, at the non-SORTS APS division of the SMMHC in Farmington, sex offender residents have been successfully released or moved to LRAs within the community after treatment.

The evidence clearly established that the lack of releases at SORTS has resulted in pervasive hopelessness. Nearly every witness who testified at trial, including several Defendants and both of Defendants' expert witnesses, agreed that SORTS residents and staff have expressed severe hopelessness and that there is a perception among committed individuals that the only way out of SORTS is to die. This hopelessness is counter-therapeutic and impedes the treatment progress of SORTS residents.

**Aged and Infirm Residents**

As discussed above, the DMH and SORTS have been aware since at least 2009 of an aging population of civilly committed men within SORTS, including men whose

progressive infirmities significantly reduced their risk to the public and made them candidates for conditional release to skilled nursing facilities.

In 2012, Dr. Englehart proposed pursuing conditional releases for two such aged and infirm residents, Marvin Morton and James Purk. Dr. Englehart noted that the physical disabilities of these residents lowered their risk to the public. (Pls.' Ex. 95 at 3.)

Over the next 15 months, Purk was hospitalized five times for chronic progressive pulmonary fibrosis and other medical conditions, which required that he be on constant oxygen support and which resulted in his extreme intolerance for physical movement. The evidence established that Purk's long history of failing health and total incapacity was well known by SORTS leadership and that Purk told staff that he did not want to die at SORTS.

In an email sent to SORTS and DMH officials on January 14, 2014, Dr. Englehart stated that it was his opinion that Purk's "extreme intolerance of exercise (even before [his most recent] hospitalization) makes him a low risk to re-offend, even with only minimal safeguards." (Pls.' Ex. 96 at 1.) Therefore, Dr. Englehart recommended that Purk be moved to a nursing facility rather than back to SORTS. *Id.* Purk's final hospitalization began on January 31, 2014, and he remained hospitalized until his death on February 8, 2014, still a civilly committed resident of SORTS. Purk's death was anticipated by SORTS. (Pls.' Ex. 102.)

Notwithstanding that SORTS' own Director of Treatment believed that Purk's risk was so low that he should be conditionally released to a nursing facility, Purk's last annual review recommended that he remain committed. On February 6, 2014, two days before Purk passed away, Defendant Erica Kempker, Psy.D., psychologist and former annual

reviewer at SORTS-Farmington, prepared Purk's annual review.  Dr. Kempker did not

interview Purk and, in the first draft of her annual review, Dr. Kempker made little mention

about Purk's failing health condition except to note that in early 2013, Purk was admitted to

an outside medical facility for respiratory failure, hyponatremia, and chronic renal

insufficiency, but that he had made a "remarkable recovery."  (Pls.' Ex. 98 at 4.)

Later in the day on February 6, 2014, Dr. Kempker learned of Purk's most recent

hospitalization and edited her annual review of him.  The final annual review, submitted by

Dr. Kempker to SORTS leadership on February 7, 2014, the day before Purk died, added

statements about Purk's "dire health" and readmissions to hospitals, but nevertheless

concluded that Purk continued to suffer from pedophilia; that there was no evidence that

Purk's mental abnormality had significantly changed since his commitment; and that Purk

should continue to be committed.  (Pls.' Ex. 101.)  Likewise, the director of the DMH did

not authorize Purk to petition for release.

One month after Purk passed away, Dr. Englehart recommended to Dr. Ramesh—

who had replaced Dr. Kempker as the annual reviewer at SORTS-Farmington—that they

should pursue conditional release of the other aged and infirm SORTS resident he identified

back in 2012, Marvin Morton.  Morton had been incapacitated since at least 2012.  Morton's

public defender, Charles Banks, offered compelling testimony that it was apparent from his

first meeting with Morton in late 2011 that Morton could barely breathe and was confined to

a wheelchair, and that in every meeting with Morton between 2011 and 2014, Morton's

condition deteriorated, to the point where Morton was eventually unable to get out of bed.

Dr. Ramesh's annual review of Morton dated March 26, 2014, a year and a half after Dr. Englehart identified Morton as a conditional release candidate, was the first review of Morton to recommend his conditional release. The annual review detailed Morton's history of severe and chronic health problems dating back to 2009. The annual review stated that it was only with considerable difficulty that Morton was able to independently transfer himself in and out of the bed and that Morton had voiced fears of dying and helplessness about his civil commitment and his ongoing medical problems. (Pls.' Ex. 262 at 8.) Dr. Ramesh's annual review of Morton concluded that "there is sufficient evidence to indicate that Mr. Morton's mental abnormality has so changed secondary to pulmonary fibrosis, his age, and a lack of recent inappropriate sexual behavior" and that Morton therefore no longer met the criteria for commitment. *Id.* at 10. Dr. Ramesh recommended that Morton be conditionally released to a nursing facility in the community, where Morton would have access to better medical care as well as support from his family.

Notwithstanding the SORTS annual reviewer's recommendation that Morton no longer met the criteria for civil commitment, Director Shafer did not authorize Morton to petition for conditional release. Morton's public defender, Banks, sought the director's approval before filing a petition for conditional release on behalf of Morton, in order to avoid the two-step process for petitions filed without approval. After waiting over three months for an authorization that never came, Banks filed the petition for Morton's conditional release without the director's approval on July 25, 2014. Dr. Englehart informed Banks that after Morton filed his own petition, the process to obtain Director Shafer's authorization halted, as a result of internal DMH rules, thereby foreclosing the

avenue of director approval.  When Banks offered to dismiss Morton's self-filed petition so that Director Schafer could authorize the petition and speed up the process for conditional release, Dr. Englehart informed Banks that it would take even longer to go through the DMH's three-step process to obtain director approval than it would to proceed with the two-step court hearing process for petitions filed without approval.

The first preponderance hearing for Morton's petition for conditional release without director approval was held on February 24, 2015.  Morton was in the hospital at that time, in a terminal condition.  In fact, just prior to the hearing, Dr. Englehart and another SORTS physician made calls to the hospital to determine if Morton was still alive, as the hearing would be moot if Morton passed away before it started.  At the preponderance hearing, both Dr. Englehart and Dr. Ramesh testified in favor of Morton's conditional release.  The Attorney General's office hired an out-of-state expert witness who opined that, notwithstanding Morton's imminent terminal condition of which the expert was informed, Morton still met the criteria for commitment.  The court found that Morton's physical condition made it unlikely that he would commit an act of sexual violence, and ordered the parties to meet and confer in one month to set the final trial on the petition for conditional release.  Morton died the next morning, still a civilly committed resident of SORTS.

Eighteen men have died while civilly committed at SORTS.  The evidence established that there have been internal discussions at SORTS for several years regarding adopting a policy or procedure to "fast-track" the conditional releases of medically frail, aging, or incapacitated SORTS residents.  Even Defendant's expert witness, Dr. Stanislaus, admitted that the DMH should develop a procedure to fast-track the conditional release of

aged and infirm residents whose risk for reoffending has significantly decreased, and that one way to do this would be if her supervisor, Director Shafer, approved petitions for conditional release of these residents. But as of the date of trial, no such policy or procedure had been adopted.

The director of the DMH has never authorized an aged, infirm, or medically frail SORTS resident to petition for conditional release, to a skilled nursing facility or otherwise. And as discussed above, in the 16 years since its enactment, only two persons civilly committed under the SVP Act have been conditionally released into the community due to age and infirmity. Both Arthur and Gibson were discharged without the director's authorization and without a recommendation for release in a SORTS annual review.

SORTS does not have any contracts in place to allow aged and infirmed residents, whom SORTS officials agree no longer meet the dangerousness requirement for commitment, to move to LRAs in the community. The DMH projects a population of 41 residents over the age of 65 at SORTS in the next 5 years, and 92 residents over the age of 65 in the next 10 years. (Pls.' Ex. 18.)

## **CONCLUSIONS OF LAW**

### **Jurisdiction**

This Court has subject matter jurisdiction over the remaining claims in Plaintiffs' Fifth Amended Complaint, pursuant to 28 U.S.C. § 1331.

Defendants argue that Plaintiffs' evidence with respect to a "small number of individuals," such as individuals who were considered for conditional release or who are aged and infirm, is not representative of the class and therefore cannot support Plaintiffs'

class claims.  The Court disagrees.  The evidence with respect to these individuals was used as an example to highlight alleged systemic deficiencies in risk assessment, procedures for release, and community reintegration.  And Defendants presented no persuasive evidence that the facts presented were not representative of the system as a whole.  *See Karsjens v. Jesson*, No. CIV. 11-3659 DWF/JJK, 2015 WL 3755870, at *25 (D. Minn. June 17, 2015) ("By failing to provide the necessary process, Defendants have failed to maintain the [sex offender treatment] program in such a way as to ensure that all Class Members are not unconstitutionally deprived of their right to liberty.").

**Pre-Trial Detainee Plaintiffs**

Based on Plaintiffs' assertions that named Plaintiffs Baker, Brown, Bowen, and Murphy were not committed to SORTS as of the date of trial, and did not fall within the Treatment Class definition in this case, the Court will dismiss the treatment-related claims of these Plaintiffs as moot.  However, if the status of Plaintiffs Bowen or Murphy changes such that either is committed to SORTS during the pendency of this action, he will automatically become a member of the Rule 23(b)(2) Treatment Class.  *See* Doc. No. 197 at 2 (defining "Treatment Class" to include persons "who are, or will be, during the pendency of this action, residents of SORTS of the State of Missouri as a result of civil commitment").

**Plaintiffs' Facial Challenges to the SVP Act**

Plaintiffs assert that the SVP Act is facially unconstitutional in two respects: (1) Plaintiffs assert that § 632.498 of the SVP Act unconstitutionally requires a change in abnormality before a committed person may be released, regardless of the person's reduced dangerousness;  and (2) Plaintiffs assert that § 632.505 of the SVP Act, which governs

conditional release, unconstitutionally fails to provide for full, unconditional release because there is no mechanism for the conditions of release to terminate.[7]

"[A] plaintiff can only succeed in a facial challenge by establishing that no set of circumstances exists under which the [state law] would be valid, i.e., that the law is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (citation omitted). "Facial challenges are disfavored for several reasons," including that they "run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Id.* at 450 (citation omitted); *see also Roark v. S. Iron R-1 Sch. Dist.*, 573 F.3d 556, 564 (8th Cir. 2009) (noting this "well-established principle" and that it "applies with particular force to exercise of a court's declaratory judgment discretion where governmental action is involved") (citation omitted).

---

[7]    Plaintiffs also find problematic the SVP Act's use of different wording to describe the standards for commitment and release. However, they assert that these inconsistencies in language are relevant to their as-applied challenge, not their facial challenge. (Doc. No. 449 at 9 n.3.) In any event, the wording of the SVP Act is nearly identical to the Kansas SVP statute, which the United States Supreme Court upheld against a facial challenge. *See Kansas v. Hendricks*, 521 U.S. 346, 352-353, 364 (1997) (upholding the Kansas SVP statute against a facial challenge, where the statute defined an SVP as a person "who has been convicted of or charged with a sexually violent offense and who suffers from a mental abnormality . . . which makes the person likely to engage in the predatory acts of sexual violence"; committed SVPs "for control, care and treatment until such time as the person's mental abnormality . . . has so changed that the person is safe to be at large"; and provided for immediate release when the person is adjudged "safe to be at large"); *see also* 1994 Kan. Laws Ch. 316, §§ 8, 10 (requiring release of a person civilly committed as an SVP unless the state can prove that the person's mental abnormality "remains such that the person is not safe to be at large and if released is likely to engage in acts of sexual violence").

The United States Supreme Court has "repeatedly recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Addington v. Texas*, 441 U.S. 418, 425 (1979). But it has never held that strict scrutiny applies to civil commitment statutes. *See Kansas v. Hendricks*, 521 U.S. 346, 356 (1997) ("Although freedom from physical restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action, that liberty interest is not absolute," and "[i]t thus cannot be said that the involuntary civil confinement of a limited subclass of dangerous persons is contrary to our understanding of ordered liberty") (citation omitted); *Foucha v. Louisiana*, 504 U.S. 71, 117 (Thomas, J., dissenting) (noting that "a liberty interest per se is not the same thing as a fundamental right," and that the Supreme Court "has never applied strict scrutiny to the substance of state laws involving involuntary confinement of the mentally ill"); *but see Karsjens*, 2015 WL 3755870, at *26 (concluding that strict scrutiny applied to the plaintiffs' claims regarding the constitutionality of Minnesota's SVP civil commitment statute because the plaintiffs' "fundamental right to live free of physical restraint is constrained by the curtailment of their liberty."); *In re Care & Treatment of Coffman*, 225 S.W.3d 439, 445 (Mo. 2007) (concluding that Missouri's SVP Act is "subject to strict scrutiny because it affects the fundamental right of liberty").

Although it has not applied strict scrutiny to civil commitment statutes, the Supreme Court has held that "[a]t the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Jackson v. Indiana*, 406 U.S. 715, 738 (1972); *Foucha*, 504 U.S. at 79 (same).

That purpose must not be punitive, as punishment is reserved for the criminal system. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979); *Hendricks*, 521 U.S. at 373 (Kennedy, J., concurring) ("[W]hile incapacitation is a goal common to both the criminal and civil systems of confinement, retribution and general deterrence are reserved for the criminal system alone."). And a failure to consider or use "alternative and less harsh" restrictions may indicate an unconstitutional purpose to punish. *Bell*, 441 U.S. at 539 n.20. Moreover, "even if [a person's] involuntary confinement was initially permissible, it could not constitutionally continue after th[e] basis [for it] no longer existed." *O'Connor v. Donaldson*, 422 U.S. 563, 575 (1975).

As construed by the Missouri Supreme Court, the purpose for which individuals are involuntarily committed under the SVP Act is to "protect[] society from persons who are likely to commit sexually violent crimes if not committed." *Coffman*, 225 S.W.3d at 445. The United States Supreme Court has recognized that, ordinarily, "[w]e must . . . accept the state court's view of the purpose of its own law." *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 829 (1995).

Thus, Plaintiffs are correct that the Due Process Clause permits civil commitment of individuals under the SVP Act only so long as they suffer from a mental abnormality *and* are likely to commit an act of sexual violence if released. If the state's commitment scheme allows the confinement of individuals who are no longer likely to commit an act of sexual violence, regardless of whether there has been any change in their mental abnormality, the scheme will not withstand constitutional scrutiny. *See Foucha*, 504 U.S. at 75-76 ("[T]o commit an individual to a mental institution in a civil proceeding, the State is required by

the Due Process Clause to prove by clear and convincing evidence the *two statutory preconditions* to commitment: that the person sought to be committed is mentally ill *and* that he requires hospitalization for his own welfare and protection of others.") (emphasis added); *Hendricks*, 521 U.S. at 358 ("We have sustained civil commitment statutes when they have coupled proof of dangerousness with the proof of some additional factor, such as a 'mental illness' or 'mental abnormality.'"); *Addington*, 441 U.S. at 426 ("[T]he State has no interest in confining individuals involuntarily if they are not mentally ill or if they do not pose some danger to themselves or others."); *O'Connor*, 422 U.S. at 575 ("A finding of 'mental illness' alone cannot justify a State's locking a person up against his will and keeping him indefinitely in simple custodial confinement.").

However, as Plaintiffs themselves emphasize, the Missouri Supreme Court has construed the SVP Act to comport with this requirement of the Due Process Clause. *Coffman*, 225 S.W.3d at 446. In *Coffman*, the Missouri Supreme Court held that "Section 632.498 is presumed to be constitutional," and the court therefore "reject[ed] the state's interpretation of [this section] as limiting release to persons whose mental abnormality has changed, regardless of dangerousness" because "[s]uch an interpretation would violate the due process clauses of the United States and Missouri Constitutions." *Id.*; *see also Murrell v. State*, 215 S.W.3d 96, 104 (Mo. 2007) ("[D]ue process requires that a person be both mentally ill and dangerous in order to be civilly committed; the absence of either characteristic renders involuntary civil commitment unconstitutional.").

The Court must consider the Missouri Supreme Court's limiting construction in evaluating Plaintiffs' facial challenge to the SVP Act. *See Kolender v. Lawson*, 461 U.S.

352, 355 (1983) ("In evaluating a facial challenge to a state law, a federal court must, of course, consider any limiting construction that a state court or enforcement agency has proffered.") (citation omitted); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216 (1975) ("[A] state statute should not be deemed facially invalid unless it is not readily subject to a narrowing construction by the state courts.").  As construed by the state court, the SVP Act requires release if a person civilly committed as an SVP is found to be "no longer dangerous, regardless of whether the reason he is no longer dangerous is primarily mental or physical."  *Coffman*, 225 S.W.3d at 446.  So limited, the Court concludes that § 632.498 of the SVP Act does not, on its face, violate due process in the manner claimed by Plaintiffs.

Likewise, the Court finds Plaintiffs' facial challenge regarding § 632.505 of the SVP Act to be without merit.  The Court disagrees with Plaintiffs' assertions that § 632.505 does not provide a mechanism for the conditions of release to terminate.  Section 632.505 provides that the conditions of release may be modified "upon [the reviewing court's] own motion or upon petition of the [DMH], the [DOC], or the person on conditional release." Mo. Rev. Stat. § 632.505(6).   The Court reads this modification provision to permit the full, unconditional release of civilly committed persons under the SVP Act, upon an appropriate finding by the reviewing court.  Therefore, the Court concludes that § 632.505 of the SVP Act is not, on its face, unconstitutional for the reasons claimed by Plaintiffs.  The Court will deny Plaintiffs' requests for relief which seek to declare Missouri's SVP Act facially unconstitutional.

**Plaintiffs' As-Applied Challenges to Treatment and Release Procedures at SORTS**

Although the United States Supreme Court upheld an SVP statute nearly identical to Missouri's SVP as facially constitutional, and the Missouri Supreme Court upheld the Missouri SVP Act as facially constitutional, the concurring justices in both high courts expressed doubt as to whether the statutes would be constitutional as applied. *See Hendricks*, 521 U.S. at 371-73 (Kennedy, J., concurring) (providing the case-deciding vote that the Kansas SVP statute was facially constitutional, but cautioning that "[i]f the object or purpose of the Kansas law had been to provide treatment but the treatment provisions were adopted as a sham or mere pretext, there would have been an indication of the forbidden purpose to punish," and that if "civil confinement were to become a mechanism for retribution or general deterrence, . . . our precedents would not suffice to validate it"); *In re Care and Treatment of Norton*, 123 S.W.3d 170, 176 (Mo. 2003) (Wolff, J., concurring) ("While the [Missouri SVP] statutory scheme is constitutional as written, I am doubtful about its constitutionality as applied," including whether there will be a "meaningful attempt to treat those previously determined to be sick and dangerous, or whether these offenders will simply be warehoused without treatment and without meaningful efforts to re-integrate them into society.").

As noted above, Plaintiffs assert two types of as-applied constitutional challenges to the SORTS treatment program. First, Plaintiffs claim that treatment modalities at SORTS are inadequate due to staff and funding shortages. Second, Plaintiffs claim that the entire SORTS treatment program is a sham because no appropriate risk assessment and release procedures have been established, and no resident has been successfully treated and released back into the community.

The parties strongly dispute the applicable standard of review for these claims. Plaintiffs assert that strict scrutiny applies to both types of as-applied claims. Plaintiffs note that in a case challenging Minnesota's equivalent of the SVP Act, the district court applied strict scrutiny to the plaintiffs' claims. *See Karsjens*, 2015 WL 3755870, at *26. Like Plaintiffs do in their second type of as-applied claim, the plaintiffs in *Karsjens* challenged the state's failure to conduct risk assessments and failure to release civilly committed sex offenders. *Id.* at *29-31. The court in *Karsjens* found that strict scrutiny governed these systemic challenges to civil commitment because the plaintiffs had a "fundamental right to live free of physical restraint." *Id.* at *26. However, *Karsjens* did not involve any challenge to the adequacy of particular treatment modalities.

Defendants assert that, for both types of as-applied claims, Plaintiffs must satisfy the much higher burden of proving that the state action is so arbitrary and egregious as to shock the conscience. In support of this assertion, Defendants point to *Strutton*, in which a plaintiff argued that the treatment he received at SORTS was inadequate because of budget and staffing shortages, like Plaintiffs do here in their first type of as-applied claims. *Strutton*, 2010 WL 1253715, at *35. On review of *Strutton*, the Eighth Circuit found that because the right of individuals civilly committed as SVPs to mental health treatment originates from the SVP Act, not the Constitution, a substantive due process claim does not arise unless the treatment provided is "so lacking as to shock the conscience." *Strutton*, 668 F.3d at 558. However, *Strutton* did not involve any systemic challenges to risk assessment or release at SORTS.

As an initial matter, the Court concludes that neither of Plaintiffs' as-applied claims is subject to strict scrutiny. Strict scrutiny would only apply if Defendants' actions implicated a fundamental right. And federal courts are reluctant to expand fundamental rights beyond those declared by the Supreme Court. *United States v. White Plume*, 447 F.3d 1067, 1075 (8th Cir. 2006).

With respect to Plaintiffs' first type of as-applied claims, regarding adequacy of treatment, the Supreme Court has never held that civilly committed sex offenders have a fundamental right to treatment. Rather, as Defendants correctly assert, any right to treatment arises solely from the SVP Act. Therefore, under precedent binding on this Court, Plaintiffs cannot prevail on their first type of as-applied claims unless they prove that the treatment at SORTS is so lacking as to shock the conscience. *Strutton*, 668 F.3d at 558.

The bulk of the evidence Plaintiffs presented at trial in support of their adequacy-of-treatment claims was evidence of staffing and funding shortages at SORTS prior to 2010. But the Eighth Circuit reviewed the SORTS treatment program, and in 2012 found that although it may have departed from acceptable standards in the field, the treatment was not so lacking as to shock the conscience. *Strutton*, 668 F.3d at 558. The Court concludes that SORTS treatment providers have worked to improve treatment to some degree since then, and in some areas, there has been significant improvement.

For example, although SORTS continues to struggle with recruitment and funding, the evidence established that SORTS has in the last year managed to adequately staff all treatment groups and to reduce treatment group cancelations dramatically. Moreover, Defendants improved treatment methods in the last year by switching the clinical focus from

rule violations to more treatment-related behaviors. There are still many areas for improvement, as noted by Dr. Schlank and Plaintiffs' experts, such as maintaining consistency in treatment protocols, clarifying treatment goals for each phase and level, adapting treatment program materials to better meet the needs of developmentally disabled residents, and improving coordination between SORTS-Farmington and SORTS-Fulton. But the Court cannot say that these areas for improvement render the treatment modalities at SORTS so lacking as to shock the conscience. Therefore, the Court will deny relief with respect to Plaintiffs' as-applied challenges to the treatment modalities at SORTS.

But the Court reaches a different conclusion regarding Plaintiffs' second type of as-applied claims, relating to risk assessment and release of SORTS residents. These claims raise systemic challenges to the nature and duration of Plaintiffs' commitment, rather than to the adequacy of the treatment provided to Plaintiffs while committed. And while Plaintiffs may not have a constitutional right to treatment, they do have a constitutional right to avoid undue confinement.

As discussed above, the United States Supreme Court has never held that this right is a fundamental one, subject to strict scrutiny. *See Hendricks*, 521 U.S. at 356 ("Although freedom from physical restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action, that liberty interest is not absolute," and "[i]t thus cannot be said that the involuntary civil confinement of a limited subclass of dangerous persons is contrary to our understanding of ordered liberty") (citation omitted). But it has held that, at the least, the "the nature and duration of commitment bear some

reasonable relation to the purpose for which the individual is committed." *Jackson*, 406 U.S. at 738; *Foucha*, 504 U.S. at 79 (same).

Thus, Plaintiffs will prevail on their second type of as-applied claims if they can prove that the nature and duration of the commitment of SORTS residents bears no reasonable relation to the non-punitive purpose for which they were committed: to "protect[] society from persons who are likely to commit sexually violent crimes if not committed." *Coffman*, 225 S.W.3d at 445.

The Court concludes that Plaintiffs have clearly met this burden. Upon review of the evidence, the Court concludes that risk assessment and release procedures at SORTS are wholly deficient in three respects. Each of these deficiencies has resulted in the continued confinement of persons who are no longer likely to commit sexually violent offenses, in violation of Plaintiffs' rights under the Due Process Clause.

The first constitutional deficiency is the manner in which Defendants conduct annual reviews. The evidence at trial established that SORTS annual reviewers have not been applying the correct legal standard when evaluating whether a resident meets the criteria for conditional release. For example, Defendants' own expert, Dr. Schlank, indicated that the SORTS-Fulton annual reviewer refused to recommend the conditional release of residents who no longer meet the dangerousness requirement for confinement, in violation of *Coffman* and the Due Process Clause of the United States Constitution. *Coffman*, 225 S.W.3d at 446; *see also Foucha*, 504 U.S. at 75. Moreover, Defendants' other expert, Dr. Stanislaus, acknowledged that the annual reviewers at both SORTS facilities have not been

consistently applying the correct legal standard for evaluating risk and that training regarding this standard is needed but has not been provided.

"The annual review mechanism ensures involuntary confinement that was initially permissible will not continue after the basis for it no longer exists." *Murrell*, 215 S.W. 3d at 105. The Court finds that the improper application of the annual review mechanism in this case has resulted in the continued confinement of individuals beyond the time constitutionally justified.

The second constitutional deficiency is that Defendants are not properly implementing the last phase of the SORTS treatment programs, community reintegration. Evidence offered by Defendants' own experts suggests that progress through the various treatment phases at SORTS is tortuously slow, and that the lack of clear timeframes for such progress has contributed to the program's failure to release residents. Moreover, Defendants' stated goal of treating and safely reintegrating individuals back into the community is observed in theory but not in practice. SORTS admittedly has residents who, because of treatment progress or physical infirmity, have reduced their risk below the standard required for commitment and have been ready for community reintegration for some time. Yet Defendants are not releasing these residents to an LRA within the community, and have not even designed procedures to do so. Instead, Defendants are precluding such releases by imposing extra-statutory hurdles, such as an indefinite "release without discharge" condition, on all conditionally released residents. In short, while the treatment program itself is not a sham, the release portion of the program is.

Every single outside expert in this case, each of whom has extensive experience with similar SVP civil commitment programs around the country, agreed that "conditional release" means that the treated patient actually lives in the community. Indeed, the SVP Act explicitly states that "[t]he primary purpose of conditional release is to provide *outpatient* treatment and monitoring to prevent the person's condition from deteriorating to the degree that the person would need to be *returned* to a secure facility designated by the director of the department of mental health." Mo. Rev. Stat. § 632.505.1 (emphasis added).

The Court concludes that the effect of this deficiency has been to turn civil confinement into punitive, lifetime detention of SORTS residents, in violation of the Due Process Clause. *See Hendricks*, 521 U.S. at 373 (Kennedy, J., concurring); *Karsjens*, 2015 WL 3755870, at *31 (finding that Minnesota's civil commitment program for sex offenders was unconstitutionally punitive, as applied, because individuals remained confined even when, as a result of treatment progress or physical infirmity, they had reduced their risk below the level required for commitment).

The third constitutional deficiency is that release procedures at SORTS are not being performed in the manner required by the SVP Act or the Due Process Clause. The evidence at trial established that the director of the DMH has effectively abdicated his duty to authorize petitions for conditional release for persons found not likely to reoffend. The director has not authorized a single person committed under the SVP Act to petition for conditional release. Especially troubling is that Defendants appear to be stalling or blocking director approval of conditional release petitions even where the request for conditional release is supported by SORTS treatment providers and annual reviewers. Again,

Defendants have imposed extra-statutory hurdles to obtaining director approval, including a three-step process that is futile in practice. No one has ever gotten past the first step, and the only resident to reach the first step was caught in limbo indefinitely because one DMH employee was out of town.

The SVP Act is clear that the director "*shall* authorize [a] person to petition the court for release" whenever the director determines that the person is no longer "likely to commit acts of sexual violence if released." Mo. Rev. Stat. § 632.501 (emphasis added). Defendants' own expert and second-in-command to the director of the DMH, Dr. Stanislaus, admitted that obtaining the director's authorization would fast-track the conditional release process for the lowest-risk residents.

The Court concludes that the director's failure to comply with the SVP Act has resulted in the continued confinement of persons who no longer meet the criteria for commitment, and amounts to unconstitutional punishment. *See O'Connor*, 422 U.S. at 568, 577 (concluding that the jury properly found a constitutional violation upon receiving evidence that the hospital staff had the power to release a civilly committed mental patient who was no longer dangerous, even if he remained mentally ill, and that the hospital superintendent refused to allow that power to be exercised even though the undisputed testimony at trial demonstrated that the patient posed no danger to others).

In sum, the Court concludes that Plaintiffs have proved that the SVP Act is unconstitutional as applied to SORTS for the following reasons: (1) Defendants have not performed annual reviews in accordance with the SVP Act, as interpreted by the Missouri Supreme Court, and as required by the Due Process Clause; (2) Defendants have not

properly implemented any program to ensure the least restrictive environment, and have not implemented—or even designed—the community reintegration phase of the SORTS treatment programs; and (3) Defendants have not implemented release procedures, including director authorization for releases, in the manner required by the SVP Act and the Due Process Clause. As nearly every witness who testified in this case agreed, these systemic failures have created a pervasive sense of hopelessness at SORTS that is undermining what little improvement the SORTS treatment programs have made.

The Court notes that, based on the disturbing record presented at trial, it would come to the same conclusions under the shocks-the-conscience standard advocated by Defendants. The Court believes that Plaintiffs' rights to a system that includes proper risk assessment and release are rights protected by the constitutional guarantee of liberty, not merely state law. But even if these rights were grounded solely in state law, as Defendants appear to argue, the Court would find that Defendants' nearly complete failure to protect them, as set forth above, is so arbitrary and egregious as to shock the conscience.

The Constitution does not allow Defendants to impose lifetime detention on individuals who have completed their prison sentences and who no longer pose a danger to the public, no matter how heinous their past conduct. "[M]ere public intolerance or animosity cannot constitutionally justify the deprivation of a person's physical liberty." *O'Connor*, 422 U.S. at 575. Nor may the SORTS residents' liberty interests be ignored because it is politically expedient to do so. Substantial changes to the SORTS program must be made, with the support of the DMH and the state, in order to bring the program in line

with constitutional standards.  This case will proceed to the remedies phase to consider what those changes should entail.

**Plaintiffs' Challenges to the Statutory Reimbursement Scheme**

The Court concludes that Defendants are entitled to judgment on Plaintiffs' constitutional claim regarding the SORTS reimbursement scheme.  The Court previously held that Plaintiffs' treatment-related claims and their reimbursement claim overlapped to some extent, in that if Plaintiffs could prove that the treatment provided to SORTS residents is unconstitutional, they may also be able to prove that charging for such treatment is unconstitutional.

However, the Court never suggested that a finding of liability on the treatment-related claims would, per se, demonstrate liability on the reimbursement claim.  And here, the evidence shows that Defendants are, in fact, attempting to implement a credible program designed to provide treatment to patients, although it does not continue to the release phase. In order to evaluate whether the reimbursement scheme was unconstitutional, the Court needed some evidence of how the reimbursement scheme is applied and how the charges equate to the treatment provided.

Plaintiffs presented little to no such evidence at trial.  For example, the Court was given virtually no evidence to evaluate when, how, how much, and for what SORTS residents are actually charged.  And Plaintiffs barely mentioned their reimbursement claims in their post-trial briefs.   Given the absence of relevant evidence and argument, the Court concludes that Plaintiffs have failed to prove their claim that the reimbursement scheme is unconstitutional.  Defendants are entitled to judgment in their favor on Plaintiffs' claims

regarding reimbursement, which were asserted on behalf of the named Plaintiffs and the Charging Class.

<u>**CONCLUSION**</u>

The Court expresses its sincere gratitude to Plaintiffs' appointed attorneys for their dedicated representation of their clients, and assistance to the Court, in this stage of the case.

For the reasons set forth above,

**IT IS HEREBY ORDERED** that the treatment-related claims of named Plaintiffs Macon Baker, David Brown, Joseph Bowen, and William Murphy are **DISMISSED as moot**, with the understanding that if the status of these Plaintiffs changes such that they are committed to SORTS during the pendency of this action, they will automatically become members of the Rule 23(b)(2) Treatment Class.

**IT IS FURTHER ORDERED** that Plaintiffs' prayer for relief in their Fifth Amended Complaint requesting a declaration that the Missouri Sexually Violent Predators Act, Mo. Rev. Stat. §§ 632.480-632.513, is unconstitutional on its face is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' prayer for relief in their Fifth Amended Complaint requesting a declaration that the Missouri Sexually Violent Predators Act, Mo. Rev. Stat. §§ 632.480-632.513, is unconstitutional as applied and deprives Plaintiffs and the Treatment Class of their constitutional rights is **GRANTED in part**, as set forth above.

**IT IS FURTHER ORDERED** that Plaintiffs' prayers for other relief with respect to their as-applied claims regarding risk assessment and release procedures at SORTS will be addressed in the second phase of trial (the "Remedies Phase").

**IT IS FURTHER ORDERED** that, except as set forth above, Plaintiffs' prayers for relief in their Fifth Amended Complaint, asserted on behalf of themselves and the Treatment and Charging Classes, are **DENIED**.

*Audrey G. Fleissig*
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 22nd day of December, 2015.